Stacey Vucko, SBN 6296832
VUCKO LAW LLP
2208 Midwest Road, Suite 104
Oak Brook, IL 60523
San Francisco, CA 94108
Telephone:   312.522.2517
svucko@vuckolaw.com

Joshua Konecky, to appear *pro hac vice*
James Bloom, to appear *pro hac vice*
Sarah McCracken, to appear *pro hac vice*
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone:  (415) 421-7100
Facsimile:  (415) 421-7105
jkonecky@schneiderwallace.com
jbloom@schneiderwallace.com
smccracken@schneiderwallace.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| VALINDA STEPHENS and BERNARD SHURN d/b/a BNVS TRANSPORT LLC, and, DAMIEN MUHAMMAD d/b/a MEIN & MEEN TRUCKING, individually and on behalf of all others similarly situated,<br><br>   Plaintiffs,<br>v.<br><br>C&K TRUCKING, LLC,<br><br>   Defendant. | CASE NO. 2020-CV-4305<br><br>CLASS ACTION COMPLAINT;<br><br>(1) TRUTH IN LEASING ACT<br><br>(2) COMMON LAW<br><br>JURY TRIAL DEMANDED |

Plaintiffs, Valinda Stephens, Bernard Shurn, and Damien Muhammad, by and through their undersigned attorneys, hereby bring this Class Action Complaint against Defendant C&K Trucking, LLC ("C&K Trucking") and allege as follows:

1

## NATURE OF THE CASE

1. Plaintiffs bring this case as a class action under the Truth in Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2) and Illinois common law of contract and fraud. The TILA is a federal law that protects small "owner-operators," including Plaintiffs, against being misled and defrauded by larger trucking companies, such as Defendant C&K Trucking. Throughout the relevant time period covered by this action, Defendant C&K Trucking has engaged in an ongoing and repeated practice of violating the TILA in its dealings with Plaintiffs and the Class of owner-operators described below.

2. Defendant C&K Trucking is in the business of providing "intermodal drayage" services to shippers across the United States. Intermodal drayage refers to the use of trucks to move freight from one mode of transportation to another (e.g., from a cargo ship to a train). To provide these services to its clients (the "Shippers"), Defendant enters into standardized agreements with hundreds of much smaller owner-operators, including named Plaintiffs Valinda Stephens, Bernard Shurn, and Damien Muhammad. For the most part, these owner-operators are modest "mom and pop" companies. They often consist of just one or two individuals who, despite a formal business name and structure, do all the work themselves and have very little bargaining power when compared to a large carrier, such as Defendant.

3. Under Defendant's standardized agreements, the owner-operators must provide a truck to lease to Defendant. The owner-operators themselves often do not have sufficient funds to own the truck outright, and thus rely on financing and/or have older trucks that incur substantial maintenance and repair costs. Defendant does not pay for any of these maintenance or repair costs, but does obtain legal possession and control over the trucks by leasing them from the owner-operators. Once the trucks are leased, Defendant continues to contract with the same owner-operators to use the now-leased trucks to provide the drayage services to the shippers.

4. While the owner-operators are the individuals personally driving the trucks and doing the work, they do not have any contractual relationship with the Shippers, who remain the clients of Defendant. Instead, the owner-operators depend on Defendant for their compensation.

5. Defendant's standardized contracts with the owner operators require it to pay the

owner-operators a certain amount for hauling loads tendered by Defendant, less certain "withholdings." However, Defendant has a pattern and practice of paying the owner operators substantially less than the amount to which it agreed. Defendant also calculates the owner operators' pay in an opaque, confusing, arbitrary, and contradictory fashion, without providing the owner-operators visibility into the way the calculations are being performed, or sufficient information to verify or challenge the calculations. This results in the owner-operators constantly being short-changed on their pay.

6. Ms. Stephens and Mr. Shurn, d/b/a BNVS Transport LLC, signed contracts with C&K Trucking on or about May 28, 2019 and January 10, 2020. Mr. Muhammad, d/b/a Mein & Meen Trucking, signed a contract with C&K Trucking on or about October 2, 2019. All three contracts are nearly identical. True and correct copies of the contracts are attached hereto as Exhibits 1, 2, and 3.

7. Defendant has a pattern of paying the owner-operators lower rates than it represents it will pay them. For example, Defendant represented, via its contracts, that it would pay all three Plaintiffs a certain rate for their work, then failed to honor that rate. As another example, Defendant, through its dispatchers, quoted certain rates to Plaintiffs before they accepted loads. After Plaintiffs completed the assignment, Defendant then frequently paid Plaintiffs a different, lower rate than the rate it had previously quoted. On at least one occasion, Ms. Stephens contacted Defendant regarding the rate of pay and received three different answers from various personnel, including Defendant's dispatchers, regarding the pay rate for the load. This experience is typical not just for Plaintiffs, but for other Class members as well.

8. Defendant also fails to make clear how much it will pay owners, in violation of its contracts and the regulations. C&K fails to itemize and explain how it computes "charge-backs," or deductions, despite its legal obligation to do so under TILA and its contracts, and despite the owner-operators' requests that it do so. (E.g., Exs. 1, 2 and 3, ¶ 12, Appx. C; 49 C.F.R. § 376.12(g) and (h)). Consequently, C&K significantly underpays owner-operators. C&K also refuses to provide owner-operators documentation necessary to understand charge-backs and settlement statements, in violation of its contracts and the regulations. Similarly, Defendant fails

to provide proper accounting for owner-operators' escrow accounts, in violation of its standardized contracts and the regulations. (E.g., Exs. 1, 2, and 3, ¶ 17, Appx. C; 49 C.F.R. § 376.12(k)).

9. C&K Trucking's dishonest, unlawful conduct results in owner-operators receiving far less compensation than it owes them. In Plaintiffs' situation, for example, C&K Trucking underpaid them to the tune of tens of thousands of dollars, if not more.

10. Defendant is an "authorized carrier" under the TILA. The TILA provides strict disclosure requirements and other protections to allow owner-operators to understand how their payments and withholdings are calculated, and to prevent the kind of chronic underpayments and false calculations made by Defendant here. 49 C.F.R. § 376.12.

11. Authorized carriers like Defendant are required to "adhere[] to and perform" the TILA requirements. *Id.* TILA creates a right of action for owners working for authorized carriers who violate the requirements. 49 U.S.C. § 14704(a)(2).

12. Defendant has failed to comply with its contracts and TILA regulations, exploiting owner-operators and unlawfully underpaying them. Plaintiffs bring this action on behalf of themselves and other owner-operators to redress the wrongs Defendant has caused through these actions.

## JURISDICTION AND VENUE

13. The Court has jurisdiction over Plaintiffs' TILA claims under 28 U.S.C. § 1331.

14. This Court has supplemental jurisdiction over Plaintiffs' common law claims because they are so related to this action that they form part of the same case or controversy under Article III of the United States Constitution.

15. This Court has general jurisdiction over Defendant C&K Trucking because it resides in this District. This Court has specific jurisdiction over Defendant because it took many of the actions described herein in this District or directed those actions specifically at this District.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as Defendants have offices, conduct business and can be found in the District, and the causes of action set forth herein have arisen and occurred in part in the District. For example, Plaintiffs

regularly worked for Defendants in this District. Venue is further proper under 29 U.S.C. § 1132(e)(2) because Defendants have substantial business contacts within the state of Illinois and in this District.

## THE PARTIES

17. Plaintiffs and the proposed Class members as set forth below are current or former owner-operators across the United States who contracted with C&K Trucking to lease vehicles and provide services for C&K Trucking's clients throughout the country at any time beginning four years before the filing of this Complaint.

18. Plaintiffs Valinda Stephens and Bernard Shurn reside in Illinois. Plaintiffs Stephens and Shurn contracted to provide services to C&K Trucking, including in this Judicial District, and operated out of a terminal located in this Judicial District. Plaintiff Stephens has provided services to Defendant, throughout Illinois, since approximately June 2019. Ms. Stephens has functioned as an owner-operator, working alongside Mr. Shurn; it is a "mom and pop" operation with only the two of them. Ms. Stephens estimates that C&K Trucking has underpaid her by at least $30,000, if not more.

19. Plaintiff Damien Muhammad resides in Illinois. Mr. Muhammad contracted to provide services to C&K Trucking twice: first, from approximately February or March 2018 through August 2019, and second from approximately October 2019 through February 2020. Mr. Muhammad operated alone for the vast majority of his time providing services for C&K Trucking, with the exception of a short stint in which one other person worked with him. Mr. Muhammad estimates that C&K Trucking owes him at least $10,000, if not more.

20. Defendant C&K Trucking is and at all relevant times has been engaged in the business of providing "intermodal drayage" services throughout the United States. Defendant has at least one facility in this judicial district. Defendant C&K Trucking is headquartered in Chicago Ridge, IL.

## FACTUAL ALLEGATIONS

**A.  C&K Trucking's Network of Owner-Operators**

21. C&K Trucking operates a transportation system through which it uses trucks to

effect the transfer of freight from one mode of transportation to another for its clients ("Shippers.")

22. Defendant carries out its operations by contracting with hundreds of owner-operators, such as Plaintiffs. Under these written contracts, Defendant leases the owner-operators' trucks, with the owner-operators also providing drivers (usually themselves), to transport the freight. (Exhibits 1, 2, and 3).

### B. C&K Trucking's Owner-Operator Contracts

23. Defendant's standardized contracts with the owner-operators require Defendant to pay the owner-operators a certain amount for hauling loads tendered by Defendant. For example, under C&K Trucking's owner-operator contracts with Plaintiffs, it must pay owner-operators a specific percentage of C&K's "Adjusted Gross Revenue," or AGR, as defined in the contracts, and a specific percentage of fuel surcharges, if any are received from Shippers, for hauling loads. (Ex. 1, 2 and 3, ¶ 14, Appx. B). So-called "accessorial charges," which include detention, i.e. delays while waiting to load or unload, tarping, and loading and unloading charges, are to be paid to owner-operators based upon the same percentage of AGR. (Id., Appx. B, ¶ 1(c)). Per the contracts, these rates of pay may only be changed by agreement in writing between C&K Trucking and the owner-operators. (Id.)

24. C&K Trucking's owner-operator contracts with Plaintiffs contain lists of items that it will "charge back," or deduct, from owner-operators' pay if it pays those costs up front. Among other items, C&K Trucking includes in this list a vague, catch-all category of "operating expenses not otherwise listed." (Ex. 1-3, Appx. C at p. 15).

25. C&K Trucking's owner-operator contracts with Plaintiffs require owner-operators to deposit with it specific amounts of money to be placed in an escrow account. (Ex. 1, 2 and 3, ¶ 17). The contracts are broad, vague and non-specific as to the items to which the escrow money may be applied. The contracts require C&K Trucking to, *inter alia*, pay interest to owner-operators on the money and provide a "written itemization or explanation" of any deductions *before* making them, on a monthly basis or as part of owner-operators' "settlement statements" (pay statements). (Id.)

26. TILA requires Defendant to pay owner-operators within 15 days of C&K's receipt of certain shipping documents from the owner-operators. (49 C.F.R. § 376.12(f)). Under TILA regulations, C&K must provide settlement sheets or statements which explain the pay and any charge-backs/ deductions it has made from. (E.g., 49 C.F.R. § 376.12(h)).

27. C&K Trucking's standardized contracts require it to pay owner-operators either weekly or within 15 days of receiving certain documents from owner-operators. (Ex. 1, 2 and 3, ¶ 15). Under its standardized contracts, C&K Trucking must provide "settlement statements," which explain the pay and any charge-backs/deductions it has made. (Id.)

      **C.**      **C&K Trucking's Route and Pay Policies**

28. C&K Trucking splits payment for owner-operators' services into two categories: (1) "regional runs" and (2) "cross-town runs," based on mileage.

29. Before beginning a run, an owner-operator contacts C&K Trucking to ask which loads are available and their applicable pay rates. C&K Trucking is then supposed to inform the owner-operator of the rate either the day of or the day before the assignment.

30. C&K Trucking's policy at first regarding regional run rates was to tell the rates to owner-operators verbally. In or about July 2019, C&K Trucking began sending rates to owner-operators by text message. Despite these policies, in reality, C&K Trucking representatives generally refuse to give rates for regional runs and, even when they do, C&K Trucking will not honor those rates.

31. C&K Trucking representatives typically tell drivers that they do not know the rates for their cross town runs. C&K Trucking representatives thus effectively refuse to provide rates at all for cross-town runs. C&K Trucking further sometimes pays owner-operators for a fuel surcharge, but does not other times.

32. If an owner-operator discovers that any extra work must be done during an assignment, he or she lets C&K Trucking know by text or phone call. At that point, C&K Trucking is supposed to confirm how much additional pay the owner-operator will receive for the additional work. However, C&K Trucking frequently refuses to confirm additional pay amounts and brushes owner-operators off. C&K Trucking also sometimes pays owner-operators the local

rate for regional runs.

33. After an owner-operator runs a load, he or she must fill out a "Driver Worksheet" by hand. He or she then emails or hand delivers the worksheet to C&K Trucking's billing office.

34. On payday, owner-operators receive a "settlement statement" from C&K Trucking. If an owner-operator believes that pay is missing from his or her settlement statement, C&K Trucking requires him or her to fill out a separate worksheet to identify and itemize the missing pay. Owner-operators then hand deliver or email the separate worksheet to the billing office. C&K Trucking's practice is to effectively ignore valid disputes, either providing owner-operators some, but not all of the additional money owed, or nothing at all.

35. The named plaintiffs' experiences bring these common policies to life, as discussed below:

36. **Plaintiffs Stephens and Shurn**: Plaintiff Stephens contracted with C&K Trucking to provide services to its clients in approximately May 2019. Plaintiff Shurn works with Ms. Stephens. Other than Mr. Shurn, Ms. Stephens works with no one else.

37. Ms. Stephens frequently found that her pay did not match up with quoted rates (when she was able to obtain quotes up front, which did not always happen). Ms. Stephens also did not receive itemizations or documentation explaining charge-backs, with rare exceptions. Even when it came to those rare exceptions, the itemizations often would add up to less than was deducted from her pay. When Ms. Stephens contacted management about pay issues, they typically ignored emails, told her they would get back to her, claimed ignorance as to the issues she raised, addressed only one question within an email while ignoring the rest, or acted as though they were instructing someone to send her additional pay owed, without following through. On the rare occasions management addressed specific charge-back issues in response to Ms. Stephens' questions, their answers as to what would be charged back, and by how much, were opaque, contradictory, and misleading.

38. Defendant has not provided accounting or documentation regarding Ms. Stephens' escrow account, in violation of its contract with her and TILA regulations. Defendant also frequently took longer than fifteen days to pay Ms. Stephens for loads, in violation of its contract

with her and TILA regulations.

39. On several occasions, Defendant quoted Ms. Stephens multiple (sometimes conflicting) rates for a load, then paid her less. Ms. Stephens also found that Defendant's agents typically refused to quote any rates at all for cross-town runs. If Ms. Stephens requested a rate for a cross-town run, Defendant's agents usually said they would get back to her but would then give the run to someone else. Ms. Stephens began doing regional runs because of these issues, because Defendant paid higher rates for regional runs, and because Defendant's agents would usually quote the rate before a regional run. After Ms. Stephens switched to regional runs, however, Defendant did not consistently provide rates up front. Even when Defendant did so, it frequently paid Ms. Stephens what turned out to be local rates or otherwise underpaid her.

40. Defendant also unilaterally changed the rates for certain customers without informing Ms. Stephens. For example, with a customer called Saia, Ms. Stephens discovered in approximately January 2020 that Defendant was paying her less than the usual rate. Ms. Stephens contacted Defendant about this pay discrepancy, at which point Defendant persuaded Ms. Stephens by phone and Google Text to do the Saia run by promising to pay her the higher rate on a previous settlement statement. However, after Ms. Stephens did the run, Defendant did not follow through on the agreement and underpaid her. Ms. Stephens disputed the underpayment all the way up Defendant's chain of command. Defendant explicitly told Ms. Stephens, including in writing through its Vice President, that it would not honor its agreement with her  As another example, Ms. Stephens was quoted a rate of $615.00 for a customer called Berco via Google Text and email. However, Defendant lowered the Berco rate without Ms. Stephens' knowledge or permission, sometimes underpaying Ms. Stephens by two hundred dollars or more. These are just a couple examples of how Defendant has unilaterally changed the rates without informing Plaintiffs. Additionally, the amount by which Defendant has underpaid Ms. Stephens in general has worsened over time.

41. Ms. Stephens and Mr. Shurn also found that, on occasion, Defendant was dishonest as to documentation requirements for receiving pay. In one instance, Defendant's agents instructed Mr. Shurn, as a prerequisite to receiving pay, to give them only one document, and

leave the rest in the trailer. Mr. Shurn complied. Afterwards, Defendant's agents refused to pay Mr. Shurn, stating they refused to do so because he did not directly provide them with the documentation he had placed in the trailer on their instruction. Ms. Stephens and Mr. Shurn disputed Defendant's failure to pay. It took Defendant approximately two months to pay anything for the load. Even then, Defendant paid less than the rate it had quoted.

42. **Plaintiff Muhammad**: Plaintiff Muhammad found that even when Defendant's agents quoted him rates before he ran loads (an obligation which Defendant all too often ignored), Defendant typically failed to honor those rates, sometimes underpaying by hundreds of dollars. Mr. Muhammad did not receive proper itemizations, explanations, or documentation regarding charge-backs, making it difficult, if not impossible, for him to dispute underpayments. Defendant refused to provide Mr. Muhammad with requested documentation, such as freight bills, when he asked to see such documentation. On occasion, Defendant refused to pay him at all, stating that even though he had provided the necessary documentation, they would include the pay in the next check. Sometimes Defendant followed through on including payment in the next check, and sometimes did not. Defendant has consistently failed to provide proper accounting or documentation regarding Mr. Muhammad's escrow account, in violation of its contract with him and TILA regulations.

## CLASS ACTION ALLEGATIONS

43. Plaintiffs bring Causes of Action One through Four as a class action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), and 23(b)(2) and/or (b)(3).

44. Plaintiffs seek to represent the following class (referred to herein as the "TILA Class"):

> "All current or former owner-operators across the United States who contracted with C&K Trucking to lease vehicles and provide services for C&K Trucking's clients at any time beginning four years before the filing of this Complaint."

45. Plaintiffs seek to represent the following subclass within the broader Class defined above ("Illinois Subclass"):

> i. All current or former owner-operators who contracted with C&K Trucking to lease vehicles and provide services for C&K Trucking's clients at any time beginning

ten years before the filing of this Complaint, and who presented themselves for work in Illinois.

**D.     Ascertainability**

46.    The proposed Class is ascertainable because it comprises a discrete, well defined and objectively identifiable group – all current or former owner-operators across the United States who contracted with C&K Trucking to lease vehicles and provide services for C&K Trucking's clients at any time beginning four years before the filing of this Complaint. The Class members have been assigned truck numbers are easily identifiable from Defendants' business records. The Illinois Subclass is similarly discrete, well-defined, and objectively identifiable.

**E.     Numerosity**

47.    Defendants have contracted with several hundred owner-operators or more to provide intermodal drayage services nationwide within the four years preceding the filing of this Complaint. Class members are therefore far too numerous to be individually joined in this lawsuit.

**F.     Existence and Predominance of Common Questions of Law and/or Fact**

48.    Common questions of law and/or fact exist as to the members of the Class and, in addition, common questions of law and/or fact predominate over questions affecting only individual members of the Class. The common questions include the following:

  i.    Whether C&K Trucking's standardized contract with owner-operators violates TILA regulations;

 ii.    Whether C&K Trucking's conduct and policies have resulted in violations of TILA regulations;

iii.    Whether C&K Trucking has not adhered to and performed 49 C.F.R. § 376.12's requirements;

 iv.    Whether C&K Trucking's standardized contracts fail to clearly disclose the actual calculation methods used to determine the amount to be paid to operator-owners;

  v.    Whether C&K Trucking fails to comply with its obligation to make clear how much it would pay owner-operators for their services;

vi. Whether C&K Trucking fails to provide the documentation required under 49 C.F.R. § 376.12 and other applicable regulations, such that owner-operators can determine how rates and charges were computed;

vii. Whether C&K Trucking's standard contract fails to clearly specify which items may be charged back;

viii. Whether C&K Trucking's standard contract fails to clearly specify how charge-backs will be calculated;

ix. Whether C&K Trucking fails to afford owner-operators copies of those documents necessary to determine the validity of charge-backs;

x. Whether C&K Trucking's standardized contracts fail to properly specify the amounts which will be charged back to an owner-operator for insurance;

xi. Whether C&K Trucking fails to make clear to owner-operators how much it would charge back for insurance;

xii. Whether C&K Trucking fails to administer owner-operators' escrow funds as required by 49 C.F.R. § 376.12 and other applicable regulations;

xiii. Whether C&K Trucking makes payment to owner-operators contingent on documents it is prohibited from demanding as a precondition for payment;

xiv. Whether C&K Trucking fails to provide sufficient explanation of payments and charge-backs in its settlement statements;

xv. Whether C&K Trucking fails to provide settlement statements in a timely manner;

xvi. Whether C&K Trucking has engaged in a pattern and practice of failing to pay owner-operators the amounts to which they are entitled under their contracts and applicable law;

xvii. Whether C&K Trucking has engaged in a pattern and practice of charging back more from the owner-operators than it is legally and contractually entitled to;

xviii. Whether C&K Trucking fails to notify owner-operators of changes in existing deduction items;

xix. Whether C&K fails to properly account for its handling of owner-operators' escrow accounts;

xx. The injunctive and/or monetary relief to which Plaintiffs and the Class may be entitled because of the violations alleged herein;

Additionally, as to the Illinois Subclass:

xxi. Whether C&K Trucking's policies and practices result in false statements of material fact to owner-operators regarding, *inter alia*, their pay rates, charge-backs, the method of calculating pay, and the pay to which they were entitled;

xxii. Whether C&K Trucking is aware that its policies and practices result in false statements of material fact to owner-operators regarding, *inter alia*, their pay rates, charge-backs, the method of calculating pay, and the pay to which they were entitled;

xxiii. Whether C&K Trucking intended its false statements regarding, *inter alia*, their pay rates, charge-backs, the method of calculating pay, and the pay to which they were entitled to induce owner-operators to contract with it, and to continue providing services to its clients;

xxiv. Whether owner-operators relied upon C&K Trucking's false statements in choosing to contract with C&K Trucking and provide ongoing services to its clients;

xxv. The injunctive and/or monetary relief to which Plaintiffs and the Subclass may be entitled because of the violations alleged herein;

**G.  Typicality**

49. Plaintiffs' claims are typical of the claims of the Class.  Defendant's common course of conduct of violating TILA regulations and its contracts, thereby underpaying owner-operators, caused Plaintiffs and the proposed Class to sustain the same or similar injuries and damages.  Plaintiffs' claims are thereby representative of and co-extensive with the claims of the proposed Class.

### H. Adequacy

50. Plaintiffs are adequate representatives of the Class because they are members of the Class and their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

### I. Predominance

51. Questions of law and/or fact regarding Defendant's policies and practices and whether they comply with TILA regulations and/or its standardized contracts, predominate over any questions affecting individual class members. Similarly, questions of law and/or fact regarding Defendant's deliberate misrepresentations regarding pay predominate over any questions affecting individual class members.

### J. Superiority

52. The class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each member of the Class, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Furthermore, individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court, and avoids the problem of inconsistent judgments.

### K. Injunctive and Declaratory Relief

53. Injunctive and corresponding declaratory relief for the Class as a whole is appropriate under Federal Rule of Civil Procedure 23(b)(2), as Defendants' standardized contracts apply generally to the class, as do Defendants' policy, pattern, and/or practice of refusing to comply with TILA regulations, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Truth in Leasing Act
### 49 U.S.C. § 14704(a)(2)

54. Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth below.

55. 49 U.S.C. § 14704(a)(2) creates a right of action for damages arising from an authorized carrier's violation of Truth in Leasing Act ("TILA") regulations.

56. Plaintiffs and the Class are "owners" who leased their vehicles to C&K Trucking, an "authorized carrier," for use in C&K Trucking's business, with Plaintiffs also providing the drivers. Plaintiffs are not "agents" of C&K Trucking. Plaintiffs' leases and contracts with C&K Trucking are subject to TILA.

57. C&K Trucking's policies and practices resulted in violations of TILA regulations and its contracts/leases with Plaintiffs and the Class, which resulted in the underpayment of Plaintiffs and the Class.

58. As a direct and proximate result of these violations, Defendant has damaged Plaintiffs and the Class in amounts to be determined according to proof at trial.

59. Pursuant to 49 U.S.C. § 14704(a)(1), Plaintiffs, on behalf of themselves and the other aggrieved owner-operators, are entitled to injunctive relief.

60. Pursuant to 49 U.S.C. § 14704(e), Plaintiffs, on behalf of themselves and the other aggrieved owner-operators, are entitled to an award of reasonable attorneys' fees.

### SECOND CAUSE OF ACTION
### Breach of Contract
### Common Law

61. Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth below.

62. Plaintiffs and the Class are "owners" who have contracts with C&K Trucking to lease their vehicles to it for use in its business.

63. Plaintiffs and the Class have been entitled to certain rates and payments under their

contracts with C&K Trucking.

64. C&K Trucking has failed to honor the rates and payments to which Plaintiffs and the Class were lawfully entitled.

65. C&K Trucking unilaterally changed rates and payments, without following the procedure its contracts require and without Plaintiffs' or the Class' permission.

66. As a proximate result of these contract breaches, Defendant has damaged Plaintiffs and the Class in amounts to be determined according to proof at trial.

### THIRD CAUSE OF ACTION
### Fraud
### Common Law

67. Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth below.

68. C&K Trucking made false statements of material fact to Plaintiffs and the Class regarding its payment and rate structure, and how much it would pay them for their services, including but not limited to:

   i. Quoting specific rates for loads, then paying less;
   ii. Promising a certain pay structure in its standardized contracts, then failing to honor that structure;
   iii. Unilaterally lowering the price for loads without informing owner-operators ahead of time/without their consent;
   iv. Agreeing to honor specific rates for specific loads in response to pay disputes, then failing to honor such agreements;
   v. Misrepresenting in writing that Defendant was instructing its agents to pay additional monies owed, without actually doing so;
   vi. Promising higher rates for regional, as opposed to cross-town loads, but then underpaying and/or paying lower, cross-town rates;
   vii. Misleading owner-operators as to charge-back policies;
   viii. Misrepresenting that pay would be provided within a certain time frame, then failing to provide some or all of it; and

ix. Misleading owner-operators and drivers as to the documentation necessary to receive pay and/or the manner in which such documentation must be provided, then refusing to pay some or all of the monies owed in violation of its representations and agreements.

69. Defendant has made false statements and misrepresentations to Plaintiffs and the Class on an ongoing, regular basis. Illustrative examples are provided with specificity above.

70. C&K Trucking was aware of its false statements of material facts to Plaintiffs and the Class because, *inter alia*:

   i. Defendant's agents were aware of the pay rates their standardized contracts provide for, yet refused to honor them;

   ii. Defendant's agents were aware of pay rates promised to owner-operators, often in writing through text or e-mail, but then refused to honor those rates;

   iii. Defendant's agents provided contradictory and misleading statements in response to pay disputes, or ignored disputes altogether; and

   iv. Defendant's agents provided contradictory, misleading information regarding pay rates for specific customers' loads, charge backs, and other items.

71. C&K Trucking intended that Plaintiffs and the Class would rely on such statements in choosing to contract initially, and continue to do business with, C&K Trucking, as evidenced by, *inter alia*:

   i. its agents' deliberate decision to induce Ms. Stephens to do a run for its client, Saia, by agreeing to honor the previous rate before she did the run, then refusing to honor that agreement afterwards;

   ii. its decision to fail to honor rates when it did provide rates ahead of time, and to underpay owner-operators;

   iii. its deliberate decision to promise a specific pay structure in its standardized contracts, and subsequent failure to follow through; and

   iv. its deliberate decision to obscure the methods of calculating charge-backs, both in its standardized contracts and in addressing pay disputes, thereby misleading and

confusing owner-operators, and underpaying them.

72. Plaintiffs and the Class relied upon C&K Trucking's false statements in making business decisions, as evidenced by, *inter alia*,

   i. Choosing to do a run for a specific client based on Defendant's representation that it would honor the previous, higher rate, only to find that Defendant refused to follow through;

   ii. Choosing to accept certain loads based on quoted rates, only to discover that Defendant paid less than the rate quoted; and

   iii. Choosing to contract with C&K Trucking in the first place based on its representations as to its rate and pay structure.

73. As a proximate result of this conduct, Defendant has damaged Plaintiffs and the Class in amounts to be determined according to proof at trial, by underpaying them and fraudulently inducing them to contract with and continue to do business with C&K Trucking.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class they seek to represent in this action, request the following relief:

   a. That the Court determine that this action may be maintained as a class action under Federal Rules of Civil Procedure, Rule 23;

   b. For an order appointing Plaintiffs as representatives of the Class;

   c. For an order appointing Plaintiffs' attorneys as Class Counsel;

   d. That the Court find that Defendant has been in violation of TILA by violating its regulations, and of the Common Law by engaging in breach of contract and fraudulent misrepresentation;

   e. For an order that requires C&K Trucking to pay or otherwise credit Plaintiffs and the Class for all pay to which they are entitled, as restitution of damages incurred as a direct and proximate result of Defendants' violations of TILA, as well of its breaches of contract and fraudulent misrepresentation;

   f. That the Court enjoin Defendant from further violations of TILA pursuant to

  Federal Rule of Civil Procedure 23(b)(2), 49 U.S.C. § 14704(a)(1), and other applicable law;

g. Prejudgment interest under *Gorstein Enter. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989), its progeny, and other applicable law, holding prejudgment interest is presumptively available to victims of Federal law violations;

h. That Plaintiff and the Class be awarded reasonable attorneys' fees pursuant to 49 U.S.C. § 14704(e), and/or other applicable law;

i. That Plaintiff and the Class be awarded costs pursuant to Federal Rule of Procedure 54, and/or other applicable law;

j. Any and all other applicable statutory penalties, as provided by law; and

k. For such other and further relief as this Court deems just and proper.

Respectfully submitted,

DATED: July 22, 2020    **VUCKO LAW LLP**

By:   */s/ Stacey Vucko*
   Stacey Vucko
   Attorneys for Plaintiffs

**SCHNEIDER WALLACE COTTRELL KONECKY LLP**

By:   */s/ James Bloom*
   James Bloom
   Attorneys for Plaintiffs

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

DATED: July 22, 2020　　　　　　　**VUCKO LAW LLP**

By: ___*/s/ Stacey Vucko*___
　　　Stacey Vucko
　　　Attorneys for Plaintiffs

**SCHNEIDER WALLACE COTTRELL KONECKY LLP**

By: ___*/s/ James Bloom*___
　　　James Bloom
　　　Attorneys for Plaintiff